In re EZETA. In re BOLANOS. In re COLOCHO. In re CIENFUEGOS. In re BUSTAMANTE.

(District Court, N. D. California. September 22, 1894.)

Nos. 11,095–11,099.

1. INTERNATIONAL EXTRADITION—PRELIMINARY PROOF.
   Rev. St. U. S. § 5270, relating to extradition, provides that if the committing magistrate deems the evidence sufficient to sustain the charge, under the proper treaty, he shall certify the same, etc. The treaty between the United States and Salvador provides that fugitives from justice shall be delivered up only on such evidence of criminality as, according to the laws of the place where the fugitive is found, would justify his commitment for trial if the crime had been there committed. Rev. St. U. S. § 1014, provides that persons charged with crimes against the United States may be arrested and imprisoned or bailed "agreeable to the usual mode of process against offenders in such state." Pen. Code Cal. § 872, provides that if it appears that a public offense has been committed, and there is sufficient cause to believe defendant guilty thereof, the magistrate shall make an order to that effect, and that defendant be held to answer. *Held*, that in the examination of persons found in California, charged with being fugitives from the justice of Salvador, the evidence of criminality must conform to, and be weighed and judged by, the laws of this country, and particularly the laws of California, and that the evidence of criminality which will justify holding the accused need be such only as ordinarily obtains at a preliminary examination, and amounts to probable cause, or such as would justify a cautious man in believing the accused guilty.

2. SAME—EXAMINATION OF ACCUSED—DEPOSITIONS—WHEN ADMISSIBLE.
   Act Aug. 3, 1882 (22 Stat. 216) § 5, provides that any depositions or other papers, or copies thereof, shall be received in evidence on the hearing of any extradition case under Rev. St. U. S. tit. 26, if they are properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that they are authenticated in the manner required by this act. *Held*, that papers purporting to be depositions, so certified, are admissible on such hearing, though the recitals contained in the introductory part thereof show that they are mere statements, and not depositions.

3. SAME—ATTEMPT TO MURDER—EVIDENCE—SUFFICIENCY.
   J. C., a military officer of Salvador, was accused of attempt to murder one A. in front of the latter's residence in Salvador, while Carlos Ezeta was president, and Antonio Ezeta was general of the army, and four months before the revolution of 1894. Q., a police officer, testified the day after the alleged attempt that he heard several shots while near A.'s residence, and saw three persons running; that he found J. C. and another person together; that he captured J. C., but the other person escaped; that J. C. had a revolver in his hand, from which three shots had been fired by him at A.; and that he could not identify the person who was with J. C. The record contained a statement by J. C., designated as a deposition, made to the authorities upon his arrest, to the effect that while he, one C., and three others were passing opposite the porch of A.'s residence, A. shot at the group; that C. instantly fired a shot, and afterwards two more; that declarant fired two shots at A.; that his companions scattered, and he appeared before Q., handed him his revolver, and told him he had fired two shots at A.; that he was constantly escorting C., by order of Gen. Ezeta,

to guard him from harm, and especially in consequence of a misunderstanding between C. and A.; and that he fired the shots at A. to defend C. The accused testified to substantially the same facts contained in such statement. The record showed that the court ordered that he should remain in temporary custody. He testified also that, soon after his arrest, Gen. Ezeta procured his release; that an hour later he was rearrested by order of President Ezeta; that three days afterwards he was released by instructions of the president; and that he was never rearrested. *Held,* that the evidence showed probable cause of J. C.'s guilt.

**4. SAME—JUSTIFICATION.**

One accused of an attempt to murder in Salvador admitted that he twice shot at a person as charged, but claimed that he did so in defense of himself and another whom he was ordered by his superior military officers to protect. *Held,* that the accused should be held for extradition, his justification being matter of defense for the courts of Salvador.

**5. SAME—RELEASE OF ACCUSED WITHOUT TRIAL—EFFECT.**

The release of the accused by his superior officers, without being tried or pardoned, construed as a privilege conferred on him by executive authority equivalent to an order entered only by judicial authority in the United States, permitting him to go on his own recognizance, affords no legal objection to his arrest and trial on such charge; and the magistrate cannot consider the fact, if it exists, that the renewal of the prosecution is an effort by the present government of Salvador to secure the accused's person for the purpose of wreaking vengeance on him for the part he took against the revolutionists in the late war.

**6. SAME—MURDER—SUFFICIENCY OF EVIDENCE.**

L. and F., officers under Gen. Ezeta, were accused of hanging four unknown persons May 29, 1894, in Pulgas ravine. M., whose deposition was taken June 24, 1894, testified that "what he knows from ocular evidence only is" that F., by order of L., hung four persons in Pulgas ravine at the end of May, whose names he does not know; that some soldiers had found these persons hidden in little houses in P. canton, and L. ordered F. to hang them; that F. took them out of the house, and accomplished their death; that L. was present; and that one E. and others could testify to the matter. E., in his deposition, did not allude to such hanging, and the testimony of no other witness was produced. The accused denied their connection with such hanging. *Held,* that the evidence failed to show probable cause to believe the accused guilty.

**7. SAME.**

Gen. Antonio Ezeta, vice president and commander in chief of the army of Salvador, and J. C., L., and F., officers under him, were charged with the murder of C. H., at the village of Coatepeque, Salvador, June 3, 1894, during the revolutionary hostilities. The statement of C. H.'s father, not under oath, showed that Gen. A., an officer under Ezeta, took his son from his house on such day; that, on reaching the army, A. turned his son over to L., who ordered him delivered to Ezeta; that, on being told that his son was a spy, Ezeta struck him, and ordered him hung; that he was then taken to the plaza of Coatepeque, and hung; that F. cut the rope to see the corpse fall, and J. C. fired several shots into the body; and that his son took no part in the revolution, nor with Ezeta's forces. R. testified that Ezeta ordered C. H. to be hung, believing he was a spy and enemy, and that J. C., F., and one S. took part in carrying out the order. E. testified he saw C. H. carried away by A., J. C., and F. towards Ezeta's headquarters; that soon afterwards the same party went to the middle of the plaza, where they hung C. H. to a lamp-post; that J. C., F., and S. hung him. O. testified that Ezeta ordered C. H. hung, and delivered him to the populace to do as they wished with him. The accused all testified that they had nothing whatever to do with, and did not see, the hanging of C. H., but F. contradicted himself by afterwards stating that he saw the hanging. Ezeta testified that the forces that captured C. H. carried him through the streets; that on hearing the noise he learned of the capture; that he was afterwards informed that he was killed; and that he did not order him hung, or see him hung. *Held,* that the evidence showed prob-

able cause to believe the guilt of Ezeta, J. C., and F., considered without reference to any political aspect of the acts, but failed to show the guilt of L.

8. SAME—ROBBERY—SUFFICIENCY OF EVIDENCE.

Gen. Ezeta, then president of Salvador, was charged with robbery of the International Bank of Salvador & Nicaragua on June 5, 1894. R. testified that the agency of such bank in Santa Tecla was in charge of the house of A. & R., in which he was a partner; that on June 5, 1894, an officer and witness' clerk came to him, and told him he was wanted at such agency by a superior officer; that he went to the agency, and met a colonel and many more of Ezeta's officers; that such colonel said that, pursuant to orders of President Ezeta, the witness should hand over to him $10,000, threatening him at once if he did not do so; that he told the officer there was not $10,000 there; that the officer then told him, in an insolent way, and always threatening him, to hand over what there was without delay; that he was forced to give what there was in the vault; that he ordered the vault opened, and such officers took the money, $2,584, and carried it to Ezeta, accompanied by witness; and that Ezeta gave the money to the paymaster of his forces, who gave witness a receipt for it by Ezeta's order. R. was corroborated in all important particulars by the testimony of his clerk and partner. *Held*, that there was probable cause to believe the accused guilty.

9. SAME—ROBBERY—WHAT CONSTITUTES.

The treaty between the United States and Salvador defines robbery as "the action of feloniously and forcibly taking from the person of another goods or money by violence, or putting him in fear." *Held*, that taking money or goods from the presence or view of the party robbed, by violence, or by putting him in fear, was robbery, within the meaning of such treaty.

10. SAME—MURDER—SUFFICIENCY OF EVIDENCE.

President Ezeta, of Salvador, and J. C., his officer, were charged with the murder of one C., June 6, 1894, on the road from Santa Tecla to La Libertad. The evidence of the prosecution was that Ezeta and staff met C. on such road; that C. approached Ezeta, and told him that the enemy wanted his head; that both Ezeta and C. drew revolvers, and Ezeta fired a shot at C; that J. C. immediately followed with three shots; and that C. was killed. Which (Ezeta or C.) made the first movement to draw his revolver did not appear, but C. did not shoot. The accused admitted that they shot and killed C., but claimed that they did it in self-defense; that C., as an officer under Ezeta, had been traitorous to his trust; that he surrendered the soldiers, etc., under his command to the enemy that morning; that when he met the accused he was intoxicated, and said to Ezeta, "General, Manuel Rivas wants your head;" that he then seized Ezeta by the throat, and made a movement as if to draw his revolver; that J. C. attempted to prevent him from drawing it; that Ezeta immediately fired a shot at C.; and that J. C. followed with three shots. *Held* that, considering the act charged merely as a common crime, and eliminating the question as to whether it may be regarded as a military act, and therefore a political offense, the evidence showed probable cause to believe the accused guilty.

11. SAME—MURDER—WHAT CONSTITUTES.

The treaty between the United States and Salvador (article 3) defines murder as "comprehending the crimes designated in the penal codes of the contracting parties by the terms homicide, parricide, assassination, poisoning, and infanticide." The Penal Code of Salvador provides: "Art. 360. Murder is homicide committed with premeditation, and under one of the following circumstances: (1) With perfidy or breach of trust; (2) for a price or promise of reward; (3) by means of flood, fire or poison. The crime of murder will be punished with the penalty of death. Homicide, Art. 361. He who kills another with premeditation, and without any of the circumstances enumerated in the preceding article, or under some one of said circumstances and without premeditation, will be punished with the penalty of imprisonment at hard labor. In any other case the penalty of imprison-

ment at hard labor shall be imposed on the offender." *Held*, that homicide, as defined in the Penal Code of Salvador (article 361), constitutes murder, as defined in such treaty.

**12. SAME—COMMITTING MAGISTRATE—DETERMINATION THAT OFFENSE IS POLITICAL.**

The treaty between the United States and Salvador provides that persons charged with or convicted of any of the extraditable offenses shall be delivered up only "upon such evidence of criminality as according to the laws of the place where the fugitive or person so charged shall be found would justify his or her apprehension and commitment for trial if the crime had been there committed;" that its provisions "shall not apply to any crime or offense of a political character; that a warrant for the apprehension of a fugitive may issue, in order that he may be brought before the proper judicial authority for examination; and that if it should then be decided that according to law and the evidence the extradition is due, pursuant to the treaty, he may be given up. Rev. St. U. S. § 5270, provides that any person charged with an extraditable crime under any treaty may be arrested and brought before the magistrate, "to the end that the evidence of criminality may be heard and considered," and that if it is sufficient the magistrate must certify the same, together with a copy of all the testimony taken before him, to the secretary of state, that warrant may issue on the requisition of the proper authorities for the surrender of such person, according to the stipulations of the treaty. *Held*, that the committing magistrate has jurisdiction, and it is his duty, to determine whether the offense charged is political, and not subject to extradition.

**13. SAME—POLITICAL OFFENSES—WHAT ARE.**

The testimony showed that the alleged hanging of four persons, May 29, 1894, by L. and F., officers of President Ezeta; the killing of C. H., June 3, 1894, at Coatepeque plaza, by President Ezeta and the other defendants, his officers; the robbery of a bank, June 5, 1894, by President Ezeta; and the killing of C., June 6, 1894, by President Ezeta and J. C., his officer,—were all committed during the existence of a state of siege in the republic of Salvador, proclaimed April 29, 1894, and the progress of actual hostilities between the contending forces, wherein Ezeta and his companions were seeking to maintain the authority of the then existing government against a revolutionary uprising; that such acts were associated with the actual conflict of such armed forces; that the four persons were hung because they did not assist in defending the government; that C. H. was killed because he was considered a spy; that the robbery of the bank was for the purpose of paying Ezeta's soldiers, and was what is known in the Central and South American states as a "forced loan," recognized by the treaty between the United States and Salvador; and that the killing of C. was the result of a report that he had gone over to the enemy. *Held*, that such offenses were of a political character, and not subject to extradition.

**14. SAME—MILITARY OFFENSES AND JURISDICTION.**

The killing of C. by President Ezeta and his officer, being within the jurisdiction of the military law of Salvador, is not subject to extradition.

**15. SAME—CHANGE OF GOVERNMENT—EFFECT.**

The overthrow of the Ezeta government by such revolution, and the dissolution of its army, did not change the status of the question as to whether such offenses were within such military jurisdiction.

Applications by the republic of Salvador for the extradition of five persons, upon the following charges: (1) In re No. 11,095, Leon Bolanos and Florencio Bustamante, for the crime of murder of four persons, names unknown; (2) In re No. 11,096, Juan Cienfuegos, for an attempt to murder one Andres Amaya; (3) In re No. 11,097, Antonio Ezeta, Leon Bolanos, Jacinto Colocho, Juan Cienfuegos, and Florencio Bustamante, for the murder of one Casimiro Henriquez; (4) In re No. 11,098, Antonio Ezeta, for the robbery of the International Bank of Salvador & Nicaragua; and

(5) Antonio Ezeta and Juan Cienfuegos, for the murder of one Tomas Canas. The applications, with the exception of that for the extradition of Juan Cienfuegos for the attempt to murder (In re No. 11,096), were refused, upon the following grounds, to wit: In re No. 11,095: That the evidence of criminality against Leon Bolanos and Florencio Bustamante, for the murder of four persons (names unknown), was insufficient in law to justify committing them. In re No. 11,097: That the evidence of criminality was sufficient in law to justify committing Antonio Ezeta, Juan Cienfuegos, and Florencio Bustamante for the murder of Casimiro Henriquez, but that said crime was of a political character, and hence not extraditable under article 3 of the treaty, and that the evidence of criminality against Leon Bolanos and Jacinto Colocho, for the alleged part they took in the murder of said Casimiro Henriquez, was not sufficient in law to justify committing them for extradition. In re No. 11,098: That the evidence of criminality against Antonio Ezeta, for the robbery of the International Bank of Salvador & Nicaragua, was sufficient in law to justify his commitment on said charge, but that said crime was of a political character, and therefore not extraditable under article 3 of the treaty. In re No. 11,099: That the evidence of criminality, upon the charge of murder of one Tomas Canas, against Antonio Ezeta and Juan Cienfuegos, was sufficient in law to justify their commitment for extradition, but that said crime was of a political character, and therefore not extraditable under article 3 of the treaty. The application to commit Juan Cienfuegos for extradition, on the charge of attempt to murder one Andres Amaya, was granted; the evidence of criminality amounting to probable cause of the fugitive's guilt, and the offense not being of a political character.

Pierson & Mitchell, for the republic of Salvador.

Charles Page, Horatio S. Reubens, and Gonzalo De Quesada, for defendants.

Charles A. Garter, U. S. Atty., for the United States.

MORROW, District Judge. These matters are before me, sitting as a committing magistrate, to determine upon the application of the republic of Salvador for the extradition, under its treaty with the United States, of Antonio Ezeta, Leon Bolanos, Jacinto Colocho, Juan Cienfuegos, and Florencio Bustamante, for trial in Salvador upon five charges; three being for murder, one for attempt to murder, and one for robbery. Upon the hearing it was claimed by the refugees—First, that there was not sufficient evidence amounting to probable cause to justify the holding of the accused; and, second, that all the offenses charged, with the exception of the charge of attempt to murder made against Juan Cienfuegos, assuming that probable cause existed, were political acts, and for that reason not extraditable, by the terms of the treaty.

The constitution of the republic of Salvador provides that the president and vice president shall be elected for a term of four years. Gen. Francisco Menendez was the president, and Dr. Rafael

Ayala vice president, for the term commencing March 1, 1887, and ending March 1, 1891. On the night of June 22, 1890, Gen. Carlos Ezeta appeared at the city of San Salvador, the capital of the republic, at the head of an armed force of 600 men, and proclaimed a revolt against the then existing government. President Menendez was giving a banquet at the time, celebrating the anniversary of his triumphant occupation of the capital five years before. In the tumult that followed, he was either slain by his political enemies, or he died suddenly from the effect of the excitement caused by the hostile demonstration. The government of Menendez was overthrown, and Gen. Carlos Ezeta proclaimed provisional president by the army. He immediately assumed the reins of government, and, with the assistance of his brother, Gen. Antonio Ezeta, proceeded to establish his executive authority,—not, however, without serious opposition. He was called upon to face an armed demonstration made against him on the part of Guatemala, and to encounter resistance at home, headed by Gen. Rivas, supporting the claims of vice president Ayala for the constitutional succession to the presidency. The Ezetas, however, were successful in their military operations. In a sanguinary struggle with Gen. Rivas for the capital, the latter was defeated, and afterwards shot as a traitor. Through the intervention of the members of the foreign diplomatic corps, Guatemala was induced to agree to peace on condition that the people of Salvador should be allowed a free expression in the choice of their president; and, in September, 1890, Gen. Carlos Ezeta was elected provisional president of the republic, and, on the first day of March, 1891, he was duly installed as president, with Gen. Antonio Ezeta as vice president, for the full term of four years. Gen. Antonio Ezeta afterwards became commander in chief of the army. Reference to other disturbances that followed will not be necessary. It is sufficient for the present purpose to say that the Ezeta government managed, by the use of vigorous measures in suppressing opposition, to continue in power down to the time of the occurrences which have been described in the testimony, and deemed relevant and material in the present examination.

A knowledge of what has just been stated, pertaining to the recent history of Salvador, drawn from public reports, appears to be necessary, however, to a clear understanding of the facts involved in the charges made against the defendants. On the 29th day of April, 1894, a revolution against the Ezeta government broke out in the military garrison at Santa Ana, a city in the western part of the republic, and distant about 60 miles from the capital. The revolution appears to have involved at first only a regular battalion of 500 men, stationed at that place, but it soon spread to other departments of the republic. Gen. Antonio Ezeta, the commander in chief, was stationed at this time at Santa Ana, as was also Gen. Jacinto Colocho, the commander of the garrison. After an unsuccessful attempt to recover the garrison, these officers, with a few men, retreated to Coatepeque, a place about 12 miles nearer the capital, where a force was gathered, and from which point operations were directed against the revolutionary forces. In an engage-

ment that took place on May 3d, Gen. Ezeta was wounded, and Gen. Bolanos became commander of the army. On May 23d, Gen. Antonio Ezeta, having recovered from his wounds, resumed command, and thereafter directed the operations of the government forces in that department. In the meantime the revolution had gained strength in other departments of the republic, under the leadership of Gen. Rafael Antonio Gutierrez, who has since become president; and on June 4, 1894, Gen. Carlos Ezeta fled from the capital, and, taking passage in a vessel at La Libertad for Panama, he proceeded (so it is reported) to New York, and thence to Europe. Gen. Antonio Ezeta thereupon became the acting president. On June 4th he and his army retreated in the direction of Santa Tecla, or New San Salvador, arriving there on June 5th, and on the 6th the retreat was continued to the port of La Libertad.' Between April 29th and June 6th a number of battles and skirmishes took place between the contending forces, in which several hundred on both sides were killed and wounded. The force under Gen. Antonio Ezeta numbered at one time about 1,700 men, but it was reduced by desertions, and losses in killed and wounded, to a few hundred, when the remnant of the army, under the immediate command of Gen. Colocho, reached La Libertad. While these operations were in progress the government of the United States dispatched the United States steamer Bennington from California to Salvador, to look after the interests of citizens of the United States in that country during the revolution. This vessel was at the port of La Libertad when Gen. Antonio Ezeta and his officers and men reached that place. Among those officers, who had taken part in the military operations on the part of the government under Gen. Antonio Ezeta, were Gens. Bolanos and Colocho, previously mentioned; Lieut. Col. Juan Cienfuegos, on the staff of Gen. Ezeta; and Capt. Florencio Bustamante, field commissary. Upon the arrival of Gen. Antonio Ezeta at La Libertad, he proceeded to the American consulate, and requested asylum on board the Bennington until the arrival of the steamer San Blas, on its way to Panama. The message was signaled to Capt. Thomas, the commander of the Bennington, who granted the request, and Gen. Ezeta immediately proceeded on board the vessel. Later on in the same day, 16 others of Gen. Ezeta's company, including the officers I have named, went alongside of the Bennington, in a lighter, and applied for asylum. This request was at first refused, on account of a lack of accommodations on board the vessel; but, the pursuing revolutionary forces threatening to follow the fugitives under the beam of the Bennington, they were taken on board. Three days later the steamer San Blas arrived at La Libertad, when the commander of the Bennington proceeded to make arrangements for the transfer of the fugitives on board that vessel. The arrangements were interrupted, however, by commissioners representing the successful revolutionary party, requesting that they should have an opportunity to make a demand for the extradition of the fugitives on charges of murder, arson, robbery, and rape. The fugitives were accordingly detained on board the Bennington, and, in view of the disturbed condition of affairs in Salvador, this concession was

deemed by Capt. Thomas a courtesy to the new government, of some consequence, in the favorable influence it would probably have upon the authorities in securing the safety of American citizens residing in that country. Upon the arrival of the next vessel at La Libertad, bound for Panama, the fugitives again requested permission to leave the Bennington, that they might take passage on the departing steamer; but the request was refused by Capt. Thomas, under instructions from the secretary of the navy. The Bennington remained at La Libertad until July 25, 1894, during which time no extradition proceedings other than a demand by the government of Salvador for the surrender of the fugitives appear to have reached Capt. Thomas. The vessel then proceeded north with the five fugitives on board, who have been the subject of these proceedings. What became of the other 12 is not disclosed by the testimony in the case. The Bennington arrived at Acapulco, Mexico, July 30th or 31st, where a request on the part of the fugitives to be allowed to leave the vessel was again refused. Leaving Acapulco August 2d. the Bennington arrived off the harbor of San Francisco on the 14th of August. The government of Gen. Gutierrez, as provisional president of Salvador, was formally recognized by the president of the United States on August 3, 1894, by the reception of Dr. Horacio Guzman as envoy extraordinary and minister plenipotentiary of the republic of Salvador. This last fact may be, in part, an explanation, and a sufficient reason, why the fugitives were detained on board the Bennington until the arrival of the vessel at this port; but, however that may be, that question is not before me for consideration. In passing upon the plea to the jurisdiction, I declined to enter upon any inquiry as to the conduct of the navy department in bringing the fugitives to San Francisco. The fact that they were found by the marshal in this district was, in my opinion, sufficient for the purpose of this examination; and I now only refer to this previous history, that the charges against the accused may be considered in the light of all the surrounding circumstances.

The authority for the present examination is derived from the statutes of the United States, the treaty between the United States of America and the republic of Salvador, and a mandate issued by the department of state under date of August 11, 1894, which recites that an application had been made in due form, to the proper authorities for the arrest of Antonio Ezeta, Leon Bolanos, Jacinto Colocho, Juan Cienfuegos, and Florencio Bustamante, charged with the crimes of murder, robbery, and arson. The certificate further recites that it was alleged that the parties named were fugitives from the justice of Salvador, and were believed to be within the jurisdiction of the United States; that it was proper they should be apprehended, and the case examined in the mode provided by the laws of the United States: that those facts were certified to the end that the evidence of the criminality of the accused might be heard and considered, and, if deemed sufficient to sustain the charges. the same might be certified, together with a copy of all the proceedings, to the secretary of state, that a warrant might

issue for their surrender, pursuant to said treaty stipulation. In conformity with this mandate, Eustorjio Calderon, the consul of Salvador at this port, on the 22d day of August, 1894, filed five separate complaints against the accused, charging Juan Cienfuegos with an attempt to murder one Andres Amaya on January 3, 1894, in front of the house occupied by said Amaya as his residence in the city of San Salvador; Leon Bolanos and Florencio Bustamante, with the murder of four persons, names unknown, on the 29th of May, 1894, in the gulch of Las Pulgas, in the canton of Primavera; Antonio Ezeta, Leon Bolanos, Jacinto Colocho, Juan Cienfuegos, and Florencio Bustamante, with the murder of one Casimiro Henriquez on the 3d of June, 1894, in the village of Coatepeque; Antonio Ezeta, with the robbery of José Ruiz and Evaristo Ambrosy, constituting the firm of Ambrosy & Ruiz, having in charge the agency of the International Bank of El Salvador & Nicaragua, of the sum of $2,584, on the 3d (5th) of June, 1894, in the city of Santa Tecla, or New San Salvador; Antonio Ezeta and Juan Cienfuegos, with the murder of Tomas Canas on June 6, 1894, on the public road leading from the city or town of Santa Tecla, or New San Salvador, to the city or town of La Libertad. Upon these complaints, warrants were issued, and the accused brought before me for examination. After the testimony on the part of the government of Salvador had been introduced, it appeared insufficient to hold Jacinto Colocho on the charge preferred against him, and accordingly, on motion of counsel, he was discharged. Testimony was thereupon introduced on the part of the remaining defendants, and the question now is whether, upon the facts proven, and the rules of law applicable thereto, they, or any of them, should be held for extradition, under the terms of the treaty. For the purpose of ascertaining whether the evidence sufficiently establishes the charges of crime against the accused to justify me, as a committing magistrate, in holding them for extradition, it becomes necessary to determine at the outset the degree of proof required to support the accusations for the purpose of these proceedings.

Section 5270 of the Revised Statutes of the United States, relating to extradition, provides that:

"If, on such hearing, he [the committing magistrate] deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same," etc.

This section had its origin in section one of the act of August 12, 1848 (9 Stat. at Large, 302). The treaty under consideration was ratified in 1874, and provides that fugitives from justice shall be delivered up only "upon such evidence of criminality as according to the laws of the place where the fugitive or person so charged shall be found would justify his or her apprehension and commitment for trial if the crime had been there committed." Section 1014 of the Revised Statutes of the United States, relating to the arrest of offenders charged with any crime or offense against the United States, provides that they may be arrested and imprisoned, or bailed, "agreeable to the usual mode of process against offenders in such state."

The defendants having been found within the territory of the state of California, the law of this state must furnish the rule of procedure in this examination. The Penal Code of California, under the title relating to proceedings in criminal actions, provides as follows:

"If, after hearing the proofs, it appears either that no public offense has been committed, or that there is not sufficient cause to believe the defendant guilty of a public offense, the magistrate must order the defendant to be discharged, * * * ."

### Section 872 provides:

"If, however, it appears from the examination that a public offense has been committed, and there is sufficient cause to believe the defendant guilty thereof, the magistrate must make or endorse on the deposition an order, signed by him, to the following effect: It appearing to me that the offense in the within depositions mentioned (or any offense according to the facts, stating generally the nature thereof) has been committed, and that there is sufficient cause to believe the within-named A. B. guilty thereof, I order that he be held to answer to the same," etc.

The degree of proof that will enable the committing magistrate to determine that there is sufficient cause to believe the defendant guilty of a public offense has been discussed by eminent judicial authority. Chief Justice Marshall, sitting as a committing magistrate in the Aaron Burr Case (1 Burr's Trial, 11), stated a rule which has been followed in this country. He said:

"On an application of this kind, I certainly should not require that proof which would be necessary to convict the person to be committed, on a trial in chief, nor should I even require that which should absolutely convince my own mind of the guilt of the accused. But I ought to require, and I should require, that probable cause be shown; and I understand probable cause to be a case made out by proof, furnishing good reason to believe that the crime alleged has been committed by the person charged with having committed it."

Mr. Justice Washington, in defining the expression "probable cause," said it was "a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged." Munns v. Dupont, 3 Wash. C. C. 31, Fed. Cas. No. 9,926.

Judge Blatchford, in the Case of Farez, 7 Blatchf. 345, Fed. Cas. No. 4,645, fully confirms this view of the law as to the evidence of criminality required in an extradition case, in the following language:

"To say that the evidence must be such as to require the conviction of the prisoner if he were on trial before a petit jury would, if applied to cases of extradition, be likely to work great injustice. The theory on which treaties for extradition are made is that the place where a crime was committed is the proper place in which to try the person charged with having committed it; and nothing is required, to warrant extradition, except that sufficient evidence of the fact of the commission of the crime shall be produced to justify a commitment for trial for the crime. In acting under the thirty-third section of the judiciary act of 1789 (section 1014, Rev. St.) in regard to offenses against the United States, a committing magistrate acts on the principle that, in substance, after an examination into the matter, and a proper opportunity for the giving of testimony on both sides, there is reasonable ground to hold

the accused for trial. The contrary view would lead to the conclusion that the accused should not be given up to be tried in the country in which the offense was committed,—the country where the witnesses on both sides are presumptively to be found,—but should be tried in the country in which he may happen to be found. Such a result would entirely destroy the object of such treaties."

To the same 'effect is the doctrine declared in Re Wadge, 15 Fed. 864, 16 Fed. 332; in Re Macdonnell, 11 Blatchf. 170, Fed. Cas. No. 8,772; in Re Behrendt, 22 Fed. 699.

In the case of Benson v. McMahon, 127 U. S. 462, 8 Sup. Ct. 1240, Mr. Justice Miller, delivering the opinion of the court in that case, said:

"The subject of what proof shall be required for the delivery upon requisition of parties charged with crime is considered in article 1 of the treaty [with Mexico], in regard to which it is provided 'that this shall be done only when the fact of the commission of the crime shall be so established as that the laws of the country in which the fugitive or the person so accused shall be found would justify his or her apprehension and commitment for trial if the crime had been there committed.' Taking this provision of the treaty, and that of the Revised Statutes above recited, we are of the opinion that the proceeding before the commissioner is not to be regarded as in the nature of a final trial by which the prisoner could be convicted or acquitted of the crime charged against him, but rather of the character of those preliminary examinations which take place every day in this country before an examining or committing magistrate for the purpose of determining whether a case is made out which will justify the holding of the accused, either by imprisonment or under bail, to ultimately answer to an indictment, or other proceeding, in which he shall be finally tried upon the charge made against him."

In the examination, therefore, of persons charged with being fugitives from justice under a treaty stipulation such as we find in the present case, the evidence of criminality must conform to, and be weighed and judged by, the laws of this country, and particularly the laws of the place where the accused is found. The evidence of criminality, to justify holding the accused for the action of the executive upon surrender, need not be such as would be required at the trial of the accused, but must be such evidence as ordinarily obtains at a preliminary examination, and amount to probable cause of his guilt; probable cause being such evidence of guilt as would furnish good reason to a cautious man, and warrant him in the belief, that the person accused is guilty of the offense with which he is charged.

The first charge, in point of time, is that against Juan Cienfuegos, alias La Chucha. He is accused with attempting to murder one Andres Amaya on the 3d of January, 1894, at the city of San Salvador, in front of the house used by the said Amaya as his residence. The depositions introduced on the part of the republic of Salvador contain the statement of Andres Amaya, the party aggrieved; the testimony of Thomas Quijano, a police officer who arrested Cienfuegos; and a statement by Cienfuegos himself. The deposition of Quijano and the depositions, so called, of Amaya and Cienfuegos, were all taken on the 4th day of January, 1894, the day following the alleged attempt to murder. The statement of Andres Amaya

is briefly, that, at 10:10 o'clock on the evening of the 3d of January one Manuel Casin offended him at his own house, where he resides; that Casin was accompanied by four or five other persons; among these was Juan Cienfuegos, whom he recognized perfectly well; that this group were disguised; that they discharged their revolvers at him just at the moment he happened to be on the porch of his house, conversing with one Don Mariano Moran; that Cienfuegos was the one who fired the first shot, pointing directly at the declarant; that immediately afterwards the other persons discharged their revolvers; that he threw himself quickly on the floor, the last shot passing near his ear; that they then left; that Manuel Casin, about six days previously, struck him from behind with a revolver, discharging a shot at him without injury; that Casin, for several days, has been waylaying the declarant, to kill him; that the enmity which Manuel Casin bears towards him originated in the declarant having, as departmental revenue collector, prohibited him from entering on horseback inside a building occupied for the management of the office and for the deposit of distilled spirits, and from trampling on the guard. Thomas Quijano deposed that while on duty as a police officer, near the residence of Amaya, he heard the report of several shots; that he proceeded quickly to that place, and saw three persons running, whom he did not know; he found Cienfuegos and another person together; that the person in company with Cienfuegos succeeded in making his escape; that he managed to capture Cienfuegos; that Cienfuegos was carrying a revolver in his hand, which he handed to him; that three shots had been discharged from it; that Cienfuegos confessed to him at that moment that those shots had been fired by him at Don Andres Amaya; that he cannot identify the person in company with Cienfuegos; that he delivered the revolver to the police, and gave an account of the matter. The record which constitutes the letters rogatory requesting the surrender of Cienfuegos also contains a statement to the authorities made by Cienfuegos upon his arrest. This statement is designated at the conclusion as a deposition. He stated that he was on his way to the theater in company with Don Manuel Casin, Dante del Papa, baritone of the present opera troupe, Antonio Guicho, a gentleman named Tierno, and also another person; that when they were passing opposite the porch where Andres Amaya resides the latter was in the company of another person, whom he was unable to recognize; that Amaya directed a shot from his revolver at the group; that Manuel Casin instantly fired a shot, and afterwards two more; that the declarant fired two shots at the said Amaya; that he noticed Amaya close the porch, instantly; that all his companions scattered; that he alone appeared before Thomas Quijano, the first officer of police, and handed him his revolver, and told him that he had fired two shots at Amaya; that he saw that Amaya saved himself from the shots by placing himself behind the end column of the porch; that all of his companions wore cloaks, except Casin, who wore a sort of an overcoat, and the declarant, who was dressed in citizen's clothes; that during the two days prior thereto he was constantly escorting Don Manuel Casin, by order of Gen.

Antonio Ezeta, with instructions to guard Manuel Casin so that no one should harm him, and especially in consequence of a misunderstanding which existed between Manuel Casin and Andres Amaya; that he fired the shots at Señor Don Andres Amaya with a view of defending Don Manuel Casin.

Upon this evidence of criminality, the record shows that an order was made by the court No. 1 of first instance, at San Salvador, on the 5th day of January, 1894, that the suspected party, Don Juan Cienfuegos, should remain in temporary custody, there being sufficient cause therefor, and that the record of the proceedings should be submitted to the alcalde. Nothing further appears, from the depositions and record, relative to what other proceedings, if any, were taken against the accused, except that on June 22, 1894, an order was made by the court No. 1 of first instance that letters rogatory should issue to the commander of the Bennington for the surrender of Juan Cienfuegos for the alleged attempt to murder Andres Amaya. The accused, in his testimony before me, testified to substantially the same facts as are contained in the statement made by him upon his arrest. He admits that he shot at Don Andres Amaya at the time and place stated, and while he was in company with Manuel Casin, but he justifies himself by swearing that he shot only after Amaya had opened fire on them; and that when he did shoot he did so to defend and protect the life of Manuel Casin, whose person he had been detailed to guard by the order of his chief officer, Gen. Antonio Ezeta; that his orders were to dress in citizen's clothes, and to place himself at the order of Manuel Casin, and that he should defend him at all hazards, and, before he should allow him to be killed, that he should first allow himself to be killed. He further testified that he was taken, upon his arrest, to the police station, and was there asked to make a statement, which he did; that soon afterwards Gen. Antonio Ezeta arrived at the station, and procured his release; that an hour after that he was rearrested by order of President Carlos Ezeta; that he was put in a place where the flags are kept at the police station; that he remained there for three days, and was then released by instructions conveyed by the chief of staff from President Carlos Ezeta; that since that release he has never been rearrested for the same charge. He also testified that he knew Amaya by sight, but had never talked with him.

A technical objection is made to the depositions of Amaya and Cienfuegos. It is urged that they are but mere statements, and not depositions, and that, not being depositions, whatever they contain is not evidence against the accused. This contention is based upon the recitals as to the imposition of an oath to tell the truth, contained in the introductory part of the depositions. It appears that in all of the depositions where a witness, not a party interested, is sworn, the following recital occurs as to the administration of the oath, varying somewhat in phraseology:

"There being present the witness ——, to whom I read the penalties incurred by those who testify falsely in criminal proceedings, and, upon being sworn in legal form, he promised to tell the truth, he stated," etc.

In the statement of Andres Amaya the introductory recital is in the following form:

"A man who felt aggrieved appeared, and I instructed him as to his obligation to tell the truth, upon being interrogated by competent authorities, and he promised to do so, declaring," etc.

That of Cienfuegos reads:

"There being present a man mentioned in this proceeding, to whom I impose the obligation of telling the truth, upon being interrogated by competent authority, and he promised to do so, saying," etc.

A perusal of all the depositions introduced discloses the fact that it does not distinctly appear that the complainant or party aggrieved takes an oath in the same form as that of a witness. But in other respects the depositions are similar, and the conclusion in all of them is substantially the same. In every one the declarant appears to have been interrogated, and it is significant that the proceeding is called a deposition at the conclusion. Section 5 of the act of August 3, 1882 (22 Stat. at Large, 216), provides:

"That in all cases where any depositions, warrants, or other papers or copies thereof shall be offered in evidence upon the hearing of any extradition case under title sixty-six of the Revised Statutes of the United States, such depositions, warrants, and other papers, or the copies thereof, shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that any deposition, warrant or other paper or copies thereof, so offered, are authenticated in the manner required by this act."

It appears by the stipulation filed by counsel in these cases that all the depositions and other papers offered in evidence on the part of the republic of Salvador are so certified. This certificate covers the statement or deposition of Andres Amaya, and under the statute it must be received and admitted as evidence for all the purposes of the hearing. While the depositions were being read, objections were offered to certain portions of the testimony of some of the witnesses on the ground that the evidence was either incompetent, irrelevant, or immaterial, as, for instance, that the testimony was clearly hearsay. I sustained objections of this character, and on motion the testimony was struck out; but, doubting the propriety of this ruling, I afterwards suggested that a motion to strike out was unnecessary, as I would disregard testimony deemed inadmissible under the rules of evidence prevailing in this country. This ruling was not intended, however, to go any further than to indicate the rules of evidence applicable to the substance of the testimony. The form of the depositions or other papers is clearly covered by the certificate under the act of congress. But the statement of Andres Amaya, if deemed defective in failing to show that the deponent had been sworn to tell the truth, is not of itself essential to establish the charge against Cienfuegos. The deposition of the police officer, Thomas Quijano, which is admittedly free from the alleged defect, serves, in my opinion, to establish a

probable cause of guilt, sufficient to justify me in holding the defendant for extradition; certainly so, in view of his admissions.

As the act was committed some four months before the revolution began, it is free from any political aspect, so far as the act charged itself is concerned; and the only question to be determined is whether the evidence of criminality amounts to probable cause of the guilt of the accused. As stated above, the admission of the accused, both as it is contained in the record and as made at the hearing, that he shot at Amaya, removes any doubt upon this question. It appears to me that, even in the absence of the admissions of the accused, the evidence of criminality presented is sufficient to amount to probable cause. His justification—that he was merely acting in obedience to the orders of his superior officers in protecting the life of Casin—cannot here be considered. What that defense would amount to upon the trial of the case in Salvador cannot now be determined, nor is it necessary. The fact that he fired the shots in defense of himself and Casin is obviously a matter of defense, to be presented in the tribunals of the republic of Salvador upon a full hearing of the case, where all the witnesses of the affair may be secured. The testimony for the prosecution establishes the fact that the act charged was in fact committed. And as this evidence amounts to probable cause, the inquiry need go no further on this preliminary examination, unless there is some explanation to be made which does not contradict or impugn the testimony on the part of the prosecution, but serves to explain it so as to show that the consequence otherwise deducible does not follow. This I understand to be the law declared in U. S. v. White, 2 Wash. C. C. 29, Fed. Cas. No. 16,685; and in Catlow's Case, 16 Op. Attys. Gen. 642; 1 Moore, Extrad. p. 528.

Counsel for the defendant contends that as Cienfuegos was released by order of his superior officers, and has never been prosecuted, or any steps taken against him, for the part he took in the alleged attempt to murder Andres Amaya, until after he had taken refuge on board the Bennington, this revival of the prosecution is nothing more or less than an effort on the part of the present government of Salvador to secure the person of the accused for the purpose of wreaking their vengeance on him for the part he took against them in the late war. This argument is not, perhaps, destitute of force, but it is not a matter of which I can properly take cognizance, in view of the other features of this particular case. He was not tried for the offense, nor was he pardoned, but, being discharged from prison by order of President Don Carlos Ezeta, he appears to have enjoyed a privilege conferred by executive authority equivalent to an order entered only by judicial authority in this country, permitting the accused to be discharged from custody on his own recognizance. If this is a correct interpretation of the proceedings stated in the record, then Col. Cienfuegos has continued subject to arrest and trial upon this charge. If, as is claimed, he is being extradited for a political purpose, that is a matter which can very properly be called to the attention of the executive when he comes to review my action.

The next charge is that against Leon Bolanos and Florencio Bustamante, for the hanging on the 29th of May, 1894, of four unknown persons at Las Pulgas ravine. The accusation rests on the deposition of one witness, named Leopold Maza. This deposition was taken on June 24, 1894. The witness deposes "that what he knows from ocular evidence only is" that Florencio Bustamante, alias Monkey in the Hole, by order of Leon Bolanos, hung four persons, in Las Pulgas ravine, at the end of May, at 11 o'clock a. m.; that he does not know the names of these persons, but he knows that they were from the volcano of Santa Ana. The witness then proceeds to assign a motive for the hanging, which he says was that some soldiers had found these persons hidden in certain little houses located in Primavera canton; that Leon Bolanos carried away said persons to a house situated in Las Pulgas ravine, to take their depositions, and, said persons having declared that they had concealed themselves in consequence of not having taken part either for or against the revolution, Bolanos ordered Bustamante to hang them. The witness then goes on to state what took place at the hanging. He says that Bustamante took these persons out of the house, carrying one of them bound by the neck; that, having come to a post in the yard of the house, Bustamante tied the lasso, and dragged him by his feet, in order to hasten the execution; that he accomplished *their* death; that Bolanos was present. The witness then continues his testimony by making statements intended to implicate Antonio Ezeta and the defendants connected with this particular charge with the commission of many other offenses, and with general lawlessness. These latter statements are manifestly based upon public rumors, and are therefore hearsay. Although the witness stated at the close of his deposition that one Rodrigo Escobar and others, whose names he did not recollect, could testify in the matter, yet the deposition of Rodrigo Escobar, contained in the record, makes not the slightest allusion to the hanging in question, and the testimony of no other witness bearing upon this accusation is produced. It may be said that, in the deposition of Carmen Quinteros, reference is made to this charge, but she bases her knowledge of the facts she relates upon the publicity of the affair in the canton. Her testimony is consequently without value. I must therefore rely upon the testimony of this solitary witness, Maza, to ascertain whether probable cause of the guilt of the accused is made out. The motive testified to by him, if indeed such evidence could be accepted as against these defendants, is at best but hearsay, for the witness is very careful to say at the outset of his testimony "that what he knows from ocular evidence only is" that Bustamante hung four persons by order of Bolanos. This reservation on the part of the witness would limit his knowledge of what took place to the hanging itself, and it is difficult to understand, without some explanation, how he could know, by ocular means only, that an order was given at all, or what the motive for the alleged hanging was. Assuming that he did have such knowledge, it must have been based upon information received from others, and, being hearsay, it is not admissible against Bolanos.

This is the only evidence in the testimony of this witness implicating Bolanos in any way with the alleged murder of these four persons. The fact that Bolanos may have been present at the alleged hanging, in the absence of any testimony, other than hearsay, that he took any part or contributed in any way to the execution, is clearly not sufficient. The evidence contained in the deposition does not, in my judgment, so connect Bolanos with the alleged hanging as to warrant me in saying that I have good reason to believe that he is probably guilty. While the testimony as to Bustamante is more specific and certain, yet, taken as a whole, it is also far from being satisfactory. I am not inclined, in view of the inconsistencies and palpable hearsay testimony contained in the deposition, to place much reliance on the uncorroborated testimony of this witness. The fact cannot be overlooked that although he stated that one Rodrigo Escobar and others, whose names he did not recall, could testify in this matter, the former person, despite the fact that in his deposition he takes a wide latitude in making charges against individuals, and as to the character of crimes committed, yet fails to say a single word to substantiate the witness Maza as to this charge. In view of the magnitude of the crime, it is singular that, if four persons were in fact hung upon such slight provocation, more satisfactory evidence was not produced. A committing magistrate would not be justified, in my opinion, in holding for extradition these accused persons, on so serious a charge, upon such unsatisfactory evidence. The accused deny that they had anything to do with the hanging of four men, or any men or man, at the time and place indicated, and under the circumstances detailed. They testify that a battle took place on that day, that there were some of their soldiers killed and wounded, but that they captured no prisoners. It may be observed that the testimony of the witness Maza was not taken until the 24th of June, 1894, nearly a month after the alleged hanging took place, and nearly three weeks after the accused had sought refuge on board the Bennington. The further fact that the identity of the four persons said to have been hung was not established tends to the conclusion that the whole affair is involved in too much uncertainty to warrant a commitment of the accused for the offense charged. But, whatever may be the actual facts concerning this affair, hostilities were in progress between the governmental and revolutionary forces in the vicinity of Las Pulgas ravine at that time; and the testimony shows that the acts of the accused, assuming that the testimony of this witness is true, were associated with the military operations at that place. It remains, therefore, to determine that feature of the case, which will be done at a later stage of this opinion.

The third charge is that against all of the fugitives, viz. Antonio Ezeta, Leon Bolanos, Jacinto Colocho, Juan Cienfuegos, and Florencio Bustamante, for the murder of one Casimiro Henriquez, on June 3, 1894, at the plaza of the village of Coatepeque. Jacinto Colocho having been discharged for want of sufficient evidence to connect him with this offense, his relation to the case will not be further considered.

It appears, from the deposition of Apolonio Henriquez that on June 3, 1894, one Gen. Emilio Avelar, an officer under Gen. Ezeta, came to the deponent's house, and took his son away a prisoner; that, on arriving at the vanguard of the army, he sought to shoot his son; that Gen. Avelar was dissuaded from his purpose by the opposition made by the physicians in charge of the ambulance; that Gen. Avelar thereupon turned his son over to Gen. Bolanos, and that the latter ordered that he be delivered to Gen. Ezeta; that, while on the way to Gen. Ezeta's headquarters, the prisoner was maltreated by soldiers and women; that upon reaching Gen. Ezeta's headquarters the latter, on being told that the prisoner was a spy, struck him, and ordered him to be hung; that the women begged the general to deliver the prisoner over to them, to do as they pleased with him, which request he granted; that the prisoner was then taken to the plaza of the town of Coatepeque; that on the way he was severely maltreated; that he was hung at the plaza; that Cienfuegos, Bustamante, and another person gloated over what they had done; that Bustamante, enraged at the corpse, cut the rope, in order to see it fall, and Cienfuegos, supposing it still had life, directed several shots from his revolver into the body; that many persons can testify to all this; that there was no cause for the execution of his son, since he was neither a participant in the revolution nor in the forces of Ezeta. As it does not appear that the deponent testified as a witness under oath to the matters he undertakes to narrate, and manifestly could not have had the knowledge to so testify as to all the particulars related, his deposition cannot properly be considered as anything more than a statement of the complaint of an aggrieved party. The witness Anastacio Ruano testifies that Ezeta, believing it true that he (Casimiro Henriquez) was a spy, as well as enemy, ordered him to be hanged in the public plaza, in carrying out which order, Juan Cienfuegos, Florencio Bustamante, and one Fernando Salguero took part. Mauricio Escobar deposes that he saw Casimiro Henriquez being carried a prisoner by Gen. Emilio Avelar and the colonels, Juan Cienfuegos and Florencio Bustamante, accompanied by soldiers and women, who were stoning and clubbing the prisoner; that they directed their steps towards Ezeta's headquarters; that about a quarter of an hour later the same party retraced their steps, going towards the plaza, and then to the middle of it, where they hung Henriquez on a public lamp-post; that the authors of the deed were Florencio Bustamante, Juan Cienfuegos, and one Fernando Salguero; that declarant saw Juan Cienfuegos discharge shots into the body of Casimiro Henriquez. Horacio Olmedo testified that Ezeta gave the order to the soldiers who were conducting Casimiro Henriquez as a criminal that they should do what they pleased with him; that shortly after that he was hung in the plaza of Coatepeque; that when nearly dying he was lowered from the post, and Cienfuegos fired two shots at him. Rodrigo Escobar deposed that he heard and saw, also, that Antonio Ezeta gave the order the evening of the 3d of June, 1894, to hang Casimiro Henriquez, upon being told that the latter was of the advance guard, and he delivered him to

the populace to do as they wished with him, and in this manner he was taken away to be hung; that the declarant did not witness the hanging. Francisco Menendez testified:

"That among the many crimes perpetrated in Coatepeque during the time about which he is asked, in consequence of his having been a resident of that town, he witnessed only the death imposed upon Casimiro Henriquez, by hanging, in the plaza of said town, on the 3d of the present month [June], at about six o'clock p. m.; the order for which execution was given, as publicly known, by Antonio Ezeta. But declarant did not give his attention to whom the perpetrators of the crime were."

The defendants all testify that they had nothing whatever to do with the hanging of Casimiro Henriquez, and that they did not even witness the occurrence. It is not claimed that Antonio Ezeta was present. His connection with the alleged murder was in giving the order to execute Henriquez, and turning him over to the soldiers and women, that they might accomplish that design. One of the witnesses for the government of Salvador testifies positively that he heard and saw the order given. Ezeta testified, in answer to the question that he detail the circumstances under which he saw Casimiro Henriquez on that day, that:

"The forces that captured him [Henriquez] took him, and carried him through the streets of Coatepeque. Upon hearing the noise of the people, I inquired about the matter, and learned that he had been captured, and was being carried through the streets. Subsequently, I was informed that he had been killed. Probably, he was hung. Q. Did you see him hung? A. No, sir, I did not. I saw him when he was dead. Q. Did you order him to be hung? A. No, sir, I did not; but, in conscience, I will state that I believe he was well killed, because he was a rebel."

Cienfuegos claims that when the hanging took place he was with Gen. Ezeta at the latter's headquarters. He admits that he heard the tumult of the soldiers and women; that they were shouting, "Death to the traitor!" and that they were carrying some one, whom he could not see; and that the crowd finally turned towards the plaza, which, he testifies, was about four blocks distant from Ezeta's headquarters. He states that while all this excitement was going on he remained about the corridor of the house; that he did not follow the crowd, and took no part in the hanging. Bustamante claimed on the stand that he did not even see the execution, but subsequently in his testimony he contradicted himself by admitting that he did witness it. He claimed that he did not see the hanging because at the time he was busy with his carts stationed at the plaza; but, as the execution took place on the plaza itself, he must have witnessed it, as he subsequently admitted. But this testimony on behalf of Cienfuegos and Bustamante does not offset the positive evidence produced by the government of Salvador to the effect that Cienfuegos and Bustamante were both seen with the populace on that occasion; that they, with others, had the prisoner in custody; that they actually took part in the hanging, the particular part which each of them took in the execution being described by the witnesses in unmistakable language. From the testimony I find that there is sufficient evidence of criminality to warrant me in holding that there is in this case probable cause to

believe that Antonio Ezeta, Juan Cienfuegos, and Florencio Busta-
mante are guilty of this crime as charged. Whether the act charged
was a political offense, within the meaning of the treaty, will be
considered hereafter.

The only testimony I have been able to find in the record tending
to connect Gen. Bolanos with this affair is that of Anastacio Ruano,
that Henriquez was delivered, by order of Gen. Bolanos, to Gen.
Ezeta, and the testimony of Horacio Olmedo, "that Gen. Leon
Bolanos, having taken part in the affair, exciting the populace, in
order that the execution should be more bloody." This last state-
ment, at most, is but a mere recital, without any direct averment
as to any specific act tending to connect Bolanos with the deed.
The accused testifies that on June 3d, the day Henriquez was hung,
he was in command of the artillery on a hill outside of the city of
Coatepeque; that he did not reach the city until 7 o'clock in the
evening, and knew nothing of the hanging until he was informed
about it at 6 o'clock of that day. He denies having had any con-
nection whatever with the execution. The evidence against this
defendant is not, in my judgment, sufficient to justify his commit-
ment, and he will therefore be discharged.

The fourth charge is against Antonio Ezeta, for the robbery of
the International Bank of Salvador & Nicaragua, in the city of
Santa Tecla, or New San Salvador, on June 5, 1894. The deposi-
tions of three witnesses were introduced in evidence on the part
of the government of Salvador. The principal witness is one José
Ruiz, who testifies to all of the matters connected with the alleged
robbery. His deposition is as follows:

"The agency in this city of the International Bank of Salvador is in charge
of the house of Ambrosy & Ruiz, located in the same, of which the deponent
is a partner; that in effect, on the 5th day of this month [June], about one
o'clock in the afternoon, there arrived, where the deponent was, an officer ac-
companying his clerk, Senor Enrique Orellana, and the clerk and that officer
stated to the deponent that he was wanted at the agency by a chief or su-
perior officer, to make a transaction; that then the deponent went to the agen-
cy, and met in the same a colonel, and many other officers besides, of Gen.
Antonio Ezeta, who had on that day reached here at about ten o'clock a. m.;
that said superior officer or colonel, on seeing the deponent, said to him that,
pursuant to order of the senor president of the republic, Don Antonio Ezeta,
that he (the deponent) should hand over to him ten thousand dollars of the
funds of the said agency, threatening him at once if he did not do so; that
the deponent replied that in the agency there were not ten thousand dollars,
and that then the said colonel said to him (the deponent), in an insolent tone,
and always threatening him, that he should turn over what there might be,
but without delay, because the president, Antonio Ezeta, was becoming im-
patient; that in consequence of that the deponent saw himself forced to give
what there was in the vault of the agency, and ordered the vault opened, and,
the vault being opened, the latter, the said colonel, and the officers indicated,
extracted the money which it contained, which they counted themselves, in
presence of the deponent, and it reached the sum of two thousand five hun-
dred and eighty-four dollars, which they carried away to the said Ezeta, who
was in one of the habitations or apartments of the Gran Hotel, the deponent
having accompanied them, by order of the same colonel; that Ezeta, after re-
ceiving the said sum, ordered called the paymaster of his forces, Col. Don
Rudolf Quell, to whom the same was delivered, and the latter gave him (the
deponent) a receipt for the money, which receipt was given and placed by or-
der of the said Ezeta, and the deponent remitted then the said receipt to the

board of directors of the bank (Gerencia), furnishing it an account of what had occurred; that he (the deponent) does not know the name of the colonel, nor that of any of the other officers to whom reference has been made, and that the following persons can depose in the matter, to wit, Don Evaristo Ambrosy, his partner, who arrived at the time the money was counted, the said clerk, and the paymaster, Senor Quell; deponent declaring that the sum alluded to is exactly that which the International Bank had in cash in the safe or coffers of the said agency, and that what he has testified he both heard and saw."

The other witnesses, viz. Don Evaristo Ambrosy, the partner, and Enrique Orellana, the clerk in the bank, both corroborate the witness Ruiz in all the important particulars of fact. But it is objected by counsel for defendant that the facts as proven do not establish the crime of robbery, defined in the treaty. Article 2, subd. 4, of the treaty, defines robbery to be "the action of feloniously and forcibly taking from the person of another goods or money by violence, or putting him in fear." It is contended that as the money was not taken from the person the crime of robbery, called for by the treaty, has not been proven. The point is also made that there was no "absolute intimidation," only an "implied intimidation." It is sufficient to say that the witness Ruiz, one of the proprietors of the bank, stated unequivocally that he was threatened. As to the other point, I have no doubt that "taking from the person" includes "taking from the immediate presence of the person" as well. The definition in the treaty is in effect the common-law definition of robbery, and, as Mr. Justice Washington says:

"If a statute of the United States uses a technical term, which is known, and its meaning fully ascertained by the common or civil law, from one or the other of which it is obviously borrowed, no doubt can exist that it is necessary to refer to the source whence it is taken, for its precise meaning." U. S. v. Jones, 3 Wash. C. C. 215, Fed. Cas. No. 15,494.

According to the common-law definition, it is well settled that robbery of the person includes robbery "in the immediate presence of the person." Mr. Justice Washington, in charging a jury in the above case, gave the common-law definition, and the interpretation thereof, in the following language:

"[Robbery] is the felonious taking of goods from the person of another, or in his presence, by violence, or by putting him in fear, and against his will. It is objected that the taking must be from the person. The law is otherwise, for if it be in the presence of the owner,—as if by intimidation he is compelled to open his desk, from which his money is taken, or to throw down his purse, which the robber picks up,—it is robbery, as much as if he has put his hand into the pocket of the owner, and taken money from thence. But the taking must be in the presence of the owner."

The similarity between the common-law definition of robbery, as given by Mr. Justice Washington, and that contained in the treaty, needs no comment. The definition in the American & English Encyclopedia of Law (volume 21, pp. 414, 424), further confirms the correctness of the construction placed upon the definition of robbery contained in the treaty:

"To constitute robbery, the taking must be from the person of the party robbed. But anything taken from the presence or view of the party, or from

his protection, is constructively taken from his person." 1 Hale, P. C. 533; 2 East, P. C. 707; Reg. v. Selway, Cox, Cr. Cas. 235; State v. Calhoun, 72 Iowa, 432, 34 N. W. 194; Clements v. State, 84 Ga. 660, 11 S. E. 505.

In my opinion, it is enough, therefore, to bring the offense within the crime of robbery, as defined in the treaty of extradition, that the money or goods be taken from the presence or view of the party robbed, by violence, or by putting him in fear.

The defendant does not deny that the money was taken from the bank by his officer, Col. Juan Cienfuegos. He admits that the latter went to the bank at his orders. He claims that it was absolutely necessary to have the money for the purpose of paying the troops, who had not been paid for two days, and that it was the custom to pay the troops daily. Whether the exigencies of the military operations required that this so-called "forced loan" should be made, and was justifiable under the circumstances, remains to be considered when I come to treat of the political phase of the offenses charged. Suffice it to say that so far as the offense itself is concerned, considered without reference to any political aspect of the act, the evidence of criminality preponderates sufficiently over the testimony of the accused to justify me in saying that there is probable cause to believe the defendant guilty.

The last charge is that against Antonio Ezeta and Juan Cienfuegos, for the murder of Tomas Canas, on June 6, 1894, on the road leading from Santa Tecla to La Libertad. The facts of this alleged murder, as severally testified to by the witnesses on the part of the government of Salvador, are, briefly, that while Gen. Antonio Ezeta, with his staff, were proceeding along the road leading from Santa Tecla to La Libertad, they met one Col. Tomas Canas, who was coming from an opposite direction. Canas approached Gen. Ezeta, and told him that the enemy wanted his head. One of the witnesses states that Canas drew near to Gen. Ezeta, speaking to him at his ear; that afterwards Gen. Ezeta told them that Canas had said to him that Manuel Rivas wanted his head. Both drew their revolvers, and Gen. Ezeta fired a shot at Canas. Cienfuegos immediately followed with three shots. Canas was afterwards found dead by the roadside, with several bullet wounds in his body. Which one of the two made the first movement to draw his revolver does not appear from the evidence of the government of Salvador, but it is certain that Canas did not shoot. And in this connection the testimony of one Fernando Carranza, a boy aged 13 years, bugler to Gen. Ezeta, may be referred to. He testifies as follows:

"That on the road, and before the reaching the point called El Amatillo, Col. Tomas Canas approached near to Ezeta, and told him that the enemy wanted his head; that Juan Cienfuegos reached to where Canas stood, and wanted to take his revolver from his pocket, which he obtained; that, after the words which passed between Canas and Ezeta, the latter fired a shot at the former, and Cienfuegos fired three other shots at him."

The statement that Cienfuegos procured the revolver of Canas is not corroborated by any of the other witnesses, and is inconsistent with the testimony of Gen. Calixto Guzman, who stated that both

drew their revolvers. It is in evidence on the part of the defend-ants that Cienfuegos did make an effort to prevent Canas from touching Gen. Ezeta, and it is probably to this circumstance the witness means to refer. The defendants admit that they shot at and killed Tomas Canas, but they justify their action on the ground of self-defense. It is claimed by them that Tomas Canas had been traitorous to his trust as an officer under Gen. Antonio Ezeta, and that he had surrendered, that very morning, the soldiers, ammuni-tion, and military accouterments under his command; that when he came up to Ezeta he appeared to be somewhat intoxicated; that he exclaimed to Gen. Ezeta, "General, Manuel Rivas wants your head!" that thereupon he seized Gen. Ezeta by the throat, and also made a movement as if to draw his revolver; that Cienfuegos made an attempt to prevent Canas from drawing his revolver; that Gen. Ezeta immediately drew his revolver, and fired one shot at Canas, and Cienfuegos followed with three other shots; that Canas half turned his horse, and fell on the roadside, where he was left by Gen. Ezeta and his staff. It is objected that the facts proven do not, in any view, tend to establish the crime of murder, as de-fined by the treaty and the law of Salvador. In article 3 of the treaty the crime of murder is defined as follows: "Murder, com-prehending the crimes designated in the penal codes of the con-tracting parties by the terms homicide, parricide, assassination, poisoning, and infanticide." It is contended that "homicide, par-ricide," etc., must amount to the crime of murder, to come within the treaty,—in other words, that the extraditable offense is limited to the crime known in our law as "the killing of a human being, with malice aforethought,"—or, if we look to the law of Salvador, we must still find the facts sufficient to bring the case within the offense amounting to murder under the law of that republic. The Penal Code of Salvador provides as follows:

"Article 360. Murder is homicide committed with premeditation, and under any one of the following circumstances: First, with perfidy or breach of trust; second, for a price, or promise of reward; third, by means of flood, fire, or poison. The crime of murder will be punishable with the penalty of death.

"Article 361. Homicide. He who kills another with premeditation, and with-out any of the circumstances enumerated in the preceding article, or under some one of said circumstances, and without premeditation, will be punished with the penalty of imprisonment at hard labor. In any other case, the penal-ty of imprisonment at hard labor shall be imposed on the offender."

It is contended that the facts here proven do not show the cir-cumstances constituting murder, within the meaning of the law of Salvador, and therefore the accused cannot be extradited for that offense, and that, if the facts be held to bring the case within section 361 of the Penal Code of Salvador, still the accused cannot be ex-tradited, for that is not the crime known as murder. It seems to me that this is a refinement not justified by the terms of the treaty. I cannot understand why, if the treaty was only intended to compre-hend murder as known to our law, or what corresponds to that crime elsewhere, there should have been a further enumeration of offenses amounting to the same degree. In my opinion the article of the treaty in question should be read according to its plain and

obvious meaning in the designation under the general title of "Murder," as the crime of homicide is defined in article 361 of the Penal Code of Salvador. As the act involves principles of military law, and in that connection is claimed to constitute a political offense, this aspect of the accusation will be considered in conjunction with the other political offenses. But, eliminating the question as to whether the act may be regarded as a military act, and therefore coming within the saving clause of political offenses, and considering the act charged merely as a common crime, it is evident that the testimony of the witnesses on the part of the government of Salvador, with the admissions of the defendants, makes out the requisite case of probable cause of their guilt.

I have now reached the most important question to be considered in this examination. It is claimed by counsel for the defendants that, with the exception of the charge against Juan Cienfuegos for the attempt to murder Amaya, all the acts charged against the defendants in these several complaints were committed during the progress of actual hostilities, in which the accused were engaged as military officers under the government, acting against revolutionary forces in the field; that the crimes or offenses were therefore of a political character, and, under the treaty, not subject to extradition. Counsel for the present government of Salvador contend, on the other hand, that it is no part of my duty to determine this question; that my jurisdiction is limited to the examination of the criminality of the accused, as charged in the complaints, and, if it appears upon this examination that the evidence is sufficient to warrant me in the belief that the persons accused are guilty of the offenses charged, then I must so certify that fact to the executive department of the United States, where it may properly be determined whether the offenses are of a political character or not. The argument in support of this proposition is derived from the language of the treaty, describing the offenses made subject to extradition, and particularly the provision that persons convicted or charged with any of the crimes specified shall be delivered up only "upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his or her apprehension and commitment for trial if the crime had been there committed." It is contended that this provision necessarily excludes the jurisdiction of the committing magistrate to inquire into the political character of the offense, for the reason that under our laws there can be no crime of a political character, unless it partakes of the nature of treason. Further argument in support of this position is found in the language of section 5270 of the Revised Statutes, providing that any person charged with an extraditable crime under any treaty may be arrested and brought before the magistrate "to the end that the evidence of criminality may be heard and considered." It is claimed that this provision is a limitation upon the jurisdiction of the committing magistrate; that when he has received and considered the evidence of criminality of the accused as to the crime charged in the complaint the examination is at an end. If the evidence is not

sufficient the defendant is discharged. If it is sufficient he is required by this same section "to certify the same, together with a copy of all the testimony taken before him, to the secretary of state, that a warrant may issue, upon the requisition of the proper authorities of such foreign government for the surrender of such person; according to the stipulations of the treaty or convention;" the requirement that the testimony shall be certified to the secretary of state being for the purpose of enabling the executive department to determine whether the fugitive should be surrendered according to the stipulations of the treaty, and this inquiry would include in the present case the question whether, upon the evidence contained in the record, or found on the files of the department, the crimes charged are of a political character. The case of In re Stupp, 12 Blatchf. 515, Fed. Cas. No. 13,563, is cited to the effect that, after a commitment of the accused for surrender, and even after his discharge on habeas corpus has been refused, the president may lawfully decline to surrender him, either on the ground that the case is not within the treaty, or that the evidence is not sufficient to establish the charge of criminality. There is no doubt but that the president has this authority under the statute. There is no other review of the decision of the committing magistrate provided, and there are many reasons, arising out of public policy and the relations of one nation with another, why this review should be vested in the chief executive. But does this authority deprive the committing magistrate of the jurisdiction to determine preliminarily whether the offense proven is of a political character or not? He is to take all the testimony, and determine its sufficiency with respect to the offense charged. Does not that jurisdiction properly and necessarily include all the elements of law as well as fact? The constitution of the United States declares that treaties are part of the supreme law of the land. Then let us see what the terms of this treaty are with respect to the question under consideration. Article 3 of the treaty provides as follows: "The provisions of this treaty shall not apply to any crime or offense of a political character." Article 6 provides a method of procedure for making a requisition for the surrender of a fugitive from justice, and the issuance of a warrant for his apprehension, "in order that he may be brought before the proper judicial authority for examination. If it should then be decided that, according to law and the evidence, the extradition is due, pursuant to the treaty, the fugitive may be given up according to the forms prescribed in such cases." Plainly, the duty of the judicial authority is to decide whether extradition is due, according to law and the evidence, and pursuant to the treaty. The whole case must be considered by the magistrate, whether the questions involved arise out of the law, the evidence, or the treaty. There is no limitation in this respect as to his jurisdiction, and his duty is fully and accurately stated. The executive has a discretion in the provision that "the fugitive may be given up according to the forms prescribed in such cases," but he has no judicial authority to take testimony or make an examination; and it is difficult to understand how he could satisfactorily exercise such authority, if he

had it. But it is said that all the testimony is to be taken by the committing magistrate, and upon such testimony and the records of the state department the president is to determine whatever political questions there may be involved in the case. This is a suggestion as to the mode of procedure, rather than an argument based upon the provisions of the treaty. The case of Castioni [1891] 1 Q. B. 149, is cited in support of such a procedure; but that case was based upon the provisions of a statute clearly authorizing the proceedings, and providing: that "a fugitive criminal shall not be surrendered if the offense in respect to which his surrender is demanded is one of a political character." 33 & 34 Vict. c. 52, § 3. In this case the prohibition is not that there shall be no surrender, but that "the provisions of this treaty shall not apply to any crime or offense of a political character." The prohibition extends to the action of the committing magistrate, and terminates his jurisdiction when the political character of the crime or offense is established. In other words, he has no authority to certify such a case to the executive department for any action whatever. This view of the law does not in any way conflict with my decision upon the plea to the jurisdiction, where the political questions there suggested were outside the merits of the case, and had no relation to the criminality of the accused.

Having jurisdiction to determine whether the charges against the accused are of a political character or not, I proceed to the consideration of that question. As before stated, the charge against Juan Cienfuegos for the attempt to murder Andres Amaya does not involve any such question. The other charges do. The testimony shows that they were all committed during the progress of actual hostilities between the contending forces, wherein Gen. Ezeta and his companions were seeking to maintain the authority of the then existing government against the active operations of a revolutionary uprising. With the merits of this strife I have nothing to do. My duty will have been performed when I shall have determined the character of the crimes or offenses charged against these defendants, with respect to that conflict. During its progress, crimes may have been committed by the contending forces of the most atrocious and inhuman character, and still the perpetrators of such crimes escape punishment as fugitives beyond the reach of extradition. I have no authority, in this examination, to determine what acts are within the rules of civilized warfare, and what are not. War, at best, is barbarous, and hence it is said that "the law is silent during war."

What constitutes an offense of a political character has not yet been determined by judicial authority. Sir James Stephens, in his work, History of the Criminal Law of England (volume 2, p. 71), thinks that it should be "interpreted to mean that fugitive criminals are not to be surrendered for extradition crimes if those crimes were incidental to and formed a part of political disturbances." Mr. John Stuart Mill, in the house of commons, in 1866, while discussing an amendment to the act of extradition, on which the treaty between England and France was founded, gave this defini-

tion: "Any offense committed in the course of or furthering of civil war, insurrection, or political commotion." Hansard's Debates, vol. 184, p. 2115. In the Castioni Case, supra, decided in 1891, the question was discussed by the most eminent counsel at the English bar, and considered by distinguished judges, without a definition being framed that would draw a fixed and certain line between a municipal or common crime and one of a political character. "I do not think," said Denman, J., "it is necessary or desirable that we should attempt to put into language, in the shape of an exhaustive definition, exactly the whole state of things, or every state of things, which might bring a particular case within the description of an offense of a political character." In that case, Castioni was charged with the murder of one Rossi, by shooting him with a revolver, in the town of Bellinzona, in the canton of Ticino, in Switzerland. The deceased, Rossi, was a member of the state council of the canton of Ticino. Castioni was a citizen of the same canton. For some time previous to the murder, much dissatisfaction had been felt and expressed by a large number of inhabitants of Ticino at the mode in which the political party then in power were conducting the government of the canton. A request was presented to the government for a revision of the constitution of the canton, and, the government having declined to take a popular vote on that question, a number of the citizens of Bellinzona, among whom was Castioni, seized the arsenal of the town, from which they took rifles and ammunition, disarmed the gendarmes, arrested and bound or handcuffed several persons connected with the government, and forced them to march in front of the armed crowd to the municipal palace. Admission to the palace was demanded in the name of the people, and was refused by Rossi and another member of the government, who were in the palace. The crowd then broke open the outer gate of the palace, and rushed in, pushing before them the government officials whom they had arrested and bound. Castioni, who was armed with a revolver, was among the first to enter. A second door, which was locked, was broken open, and at this time, or immediately after, Rossi, who was in the passage, was shot through the body with a revolver, and died very soon afterwards. Some other shots were fired, but no one else was injured. Castioni fled to England. His extradition was requested by the federal council of Switzerland. He was arrested and taken before a police magistrate, as provided by the statute, who held him for extradition. Application was made by the accused to the high court of justice of England for a writ of habeas corpus. He was represented by Sir Charles Russell, now lord chief justice. The attorney general, Sir Richard Webster, appeared for the crown, and the solicitor general, Sir Edward Clarke, and Robert Woodfall, for the federal council of Switzerland. This array of distinguished counsel, and the high character of the court, commends the case as one of the highest authority. It appeared from an admission by one of the parties engaged in the disturbances "that the death of Rossi was a misfortune, and not necessary for the rising." The opinions of the judges as to the political character of the

crime charged against Castioni, upon the facts stated, is exceedingly interesting, but I need only refer to the following passages. Judge Denman says:

"The question really is whether, upon the facts, it is clear that the man was acting as one of a number of persons engaged in acts of violence of a political character with a political object, and as part of the political movement and rising in which he was taking part."

Judge Hawkins, in commenting upon the character of political offenses, said:

"I cannot help thinking that everybody knows there are many acts of a political character done without reason, done against all reason; but at the same time one cannot look too hardly, and weigh in golden scales the acts of men hot in their political excitement. We know that in heat, and in heated blood, men often do things which are against and contrary to reason; but none the less an act of this description may be done for the purpose of furthering and in furtherance of a political rising, even though it is an act which may be deplored and lamented, as even cruel and against all reason, by those who can calmly reflect upon it after the battle is over."

Sir James Stephens, whose definition as an author has already been cited, was one of the judges, and joined in the views taken as to the political character of the crime charged against Castioni. The prisoner was discharged. Applying, by analogy, the action of the English court in that case to the four cases now before me, under consideration, the conclusion follows that the crimes charged here, associated as they are with the actual conflict of armed forces, are of a political character.

The draft of a treaty on International Penal Law, adopted by the congress of Montevideo in 1888, and recommended by the International American Conference to the governments of the Latin-American nations in 1890, contains the following provision (article 23):

"Political offenses, offenses subversive of the internal and external safety of a state, or common offenses connected with these, shall not warrant extradition. The determination of the character of the offense is incumbent upon the nations upon which the demand for extradition is made; and its decision shall be made under and according to the provisions of the law which shall prove to be most favorable to the accused."

I am not aware that any part of this Code has been made the basis of treaty stipulations between any of the American nations, but the article cited may be at least accepted as expressing the wisdom of leading jurists and diplomats. The article is important with respect to two of its features: (1) It provides that a fugitive shall not be extradited for an offense connected with a political offense, or with an offense subversive of the internal or external safety of the state; and (2) the decision as to the character of the offense shall be made under and according to the provisions of the law which shall prove most favorable to the accused. The first provision is sanctioned by Calvo, who, speaking of the exemption from extradition of persons charged with political offenses, says:

"The exemption even extends to acts connected with political crimes or offenses, and it is enough, as says Mr. Faustin Hélio, that a common crime be connected with a political act, that it be the outcome of or be in the execution of such, to be covered by the privilege which protects the latter." 2 Calvo, Droit Int. (3me Ed.) p. 413, § 1262.

The second provision of the article is founded on the broad principles of humanity found everywhere in the criminal law, distinguishing its administration with respect to even the worst features of our civilization from the cruelties of barbarism. When this article was under discussion in the international American conference in Washington, Mr. Silva, of Colombia, submitted some observations upon the difficulty of drawing a line between an offense of a political character and a common crime, and incidentally referred to the crime of robbery, in terms worthy of some consideration here. He said:

"In the revolutions, as we conduct them in our countries, the common offenses are necessarily mixed up with the political in many cases. A revolutionist has no resources. My distinguished colleague General Caamaño [of Ecuador] knows how we carry on wars. A revolutionist needs horses for moving, beef to feed his troops, etc.; and since he does not go into the public markets to purchase those horses and that beef, nor the arms and saddles to mount and equip his forces, he takes them from the first pasture or shop he finds at hand. This is called robbery everywhere, and is a common offense in time of peace, but in time of war it is a circumstance closely allied to the manner of waging it." International American Conference, vol. 2, p. 615.

Looking now to the cases which have arisen in the United States, or with our immediate neighbors, where the political character of the offense has been in question, we find that the extradition proceedings have been against persons charged with acts committed against the government, and not, as in these cases, where the acts are charged against persons who for the time being represented the existing government. Nevertheless, these cases are of some value as authority upon the general question as to what constitutes an offense of a political character. I will therefore refer to these cases as I find them stated in 1 Moore on Extradition. The first case mentioned is that of William L. McKenzie. It—

"Arose under the New York statute of 1822, which authorized the governor of that state to deliver up, upon the requisition of the duly-authorized ministers or officers of foreign governments, persons charged with the commission, within the jurisdiction of such governments, of any crime, except treason, which by the laws of New York would, if there committed, be punishable with death or imprisonment in the state prison. Under this statute, Gov. Head, of Upper Canada, in 1837, made a requisition upon Gov. Marcy for the extradition of William Lyon McKenzie, a printer, on charges of murder, arson, and robbery. By the documents which accompanied the requisition, it appeared that McKenzie acted as the leader of a band of men, from six to fifteen hundred in number, who began an insurrection in Canada for the redress of alleged grievances. On the 4th of December, 1837, they assembled under arms near the city of Toronto. Gov. Head sent them a message, calling upon them to disperse, to which they replied that they would not treat with him unless they were allowed a free pardon, and unless he called a convention of the people to remodel the government. These conditions Gov. Head refused. On the night of the 4th of December a man named Moodie, in company with other persons, attempted to pass the lines of the insurgents in order to reach Toronto. While attempting to pass they were called upon to surrender themselves as prisoners. They refused, and a volley was fired by the insurgents, in which Moodie was killed. On the following day, in the prosecution of their enterprise, the insurgents burned the dwelling house of a Mr. Horne, and seized some mail bags which were in the custody of the driver of a stagecoach, and rifled them of their contents, obtaining a number of letters and some money. On the 6th of December the insurgents were dispersed by a military force under the command of Gov. Head, in a conflict in which fifty of the insurgents were killed and wound-

ed, and three of the government party wounded. When Gov. Marcy received the requisition for McKenzie's extradition. he referred the matter to the attorney general of the state, Samuel Beardsley, for an opinion. The attorney general. on December 23, 1837, gave an opinion in which, after reviewing the facts above narrated, he held that the acts with which the fugitive was charged were of a political character, and that consequently the governor was without authority to surrender him. Upon the receipt of this opinion, Gov. Marcy, on December 25, 1837, informed Gov. Head of the proceedings that had been taken upon his requisition. In this communication, Gov. Marcy stated that the documents clearly showed that McKenzie committed the crimes imputed to him, and also that previously thereto 'he had revolted and was in arms against her majesty's government of Upper Canada. His crime,' Gov. Marcy continued, 'is therefore treason, and, if a fugitive within this state, he must be regarded as a fugitive to avoid the punishment for this offense, rather than for those imputed to him in the documents accompanying your excellency's application. These latter offenses must be considered as the incidents of the alleged treason.'" 1 Moore, Extrad. p. 313 et seq.

The next case is that of certain Mexican revolutionists. Mr. Moore gives the following statement of the facts of that case:

"Several cases are found in which the government of the United States has held that the offenses with which fugitives were charged were of a political character, and hence did not afford a ground for extradition. In 1880 a band of eight Mexicans, who were suspected of being revolutionists, came over from Sonora into the territory of Arizona, where they were captured, and placed in the custody of an officer of the United States army. A demand for their surrender, addressed to the territorial authorities, was refused. Application was then made to the federal government for their extradition on the charge of larceny of cattle and of other chattels of the value of twenty-five dollars and upwards. It appeared that they had entered the town of Magdalena, and, in the professed prosecution of a political enterprise, exacted large sums of money from the inhabitants, under threats of hanging them. The Mexican minister, in preferring the request of his government for the prisoners' surrender, adverted to the circumstances, and suggested the question whether the professed political motive was not a pretense to cover criminal acts."

The United States refused to deliver up the prisoners, stating as a reason, among others, that the fact—

"That they were charged with being revolutionists shows that, whatever may have been their other crimes, they may also have been guilty of a political offense for which the treaty stipulates that no extradition shall be granted." 1 Moore, Extrad. p. 323, § 216.

The next case mentioned by Mr. Moore is that of Cazo:

"On February 3, 1887, the Mexican minister presented a request for the extradition of one 'Francisco J. Cazo and his accomplices,' charged with murder, assault with intent to commit murder, and robbery, committed in the town of Agualeguas, in the state of Nuevo Leone, Mexico, on the 11th, 12th, and 13th of July, 1886, who had taken refuge in Texas. The evidence disclosed that, three or four days previously to the 11th of July, it was reported that Cazo was coming to attack the town. Just before midnight of the 10th of July a number of persons were observed to leave the place armed, and about two o'clock on the morning of the 11th an attack was made by a party of thirty or more persons, who could not be identified, but who kept shouting. 'Hurrah for Don Francisco J. Cazo, and death to the Garra party!' The raiders kept possession of the town for nearly three days, during which time they had armed encounters with the inhabitants, seized horses and other property, and committed other acts of violence. When they departed, Cazo left a proclamation with a citizen of the town, with directions to publish it. In reply to the application for extradition. Mr. Bayard, then secretary of state, on February 7, 1887, wrote as follows: 'After a careful examination of the papers inclosed in your note, I am unable to avoid the conclusion that the

acts of Cazo and his associates, who were about thirty or forty in number, were clearly of a political character, and consequently, under the express terms of article 6 of the treaty above mentioned, are not a proper basis for extradition. The character of the outbreak, the kind and quantity of the property taken, and the mode of attack, all lead to that conclusion. Although the first assault of Cazo's party was made in the night, there was no effort to conceal the personal identity of the leader; and such property as was seized was taken, manifestly, for the purpose of military equipment, for which it was adapted. The evidence offered of the fact that Cazo led the attack is the testimony of several witnesses that the assailants cried, "Hurrah for Don Francisco J. Cazo!" and at least one witness testifies to the additional and accompanying exclamation of "Death to the Garra party!" Another witness states that Cazo left a proclamation in the hands of a resident of Agualeguas, with a view to its publication. Indeed, all the circumstances point to the conclusion that the affair was an avowed partisan political conflict.' "

The acts and motives of the accused in the cases now before me are certainly as closely identified with the acts of a political uprising, in an unsuccessful effort to suppress it, as are the acts and motives of any of the persons whose cases have been reported. The alleged hanging of four persons in Las Pulgas ravine by Bolanos and Bustamante was because the persons executed were hiding in houses located in Primavera canton; and, having declared that they had concealed themselves in consequence of not desiring to take part either for or against the revolution, Bolanos ordered Bustamante to hang them. If this statement be true, it shows that the offense was directly connected with the conflict then raging between the army under Ezeta and the revolutionary forces. It must be remembered that a state of siege was prevailing in the republic, proclaimed on April 29, 1894, and that a state of siege is the equivalent of what is known in this country as "martial law." On the question of martial law, Wheaton, in his work on International Law (3d Eng. Ed. p. 470) says:

"Martial law has been defined to be the will of the commanding officer of an armed force, or of a geographical military department, expressed in time of war within the limit of his military jurisdiction, as necessity demands and prudence dictates, restrained or enlarged by the orders of its military chief or supreme executive ruler. * * * Martial law is founded on paramount necessity. It is the will of the commander of the forces. In the proper sense, it is not law at all. It is merely a cessation, from necessity, of all municipal law, and what necessity requires it justifies. Under it a man in actual armed resistance may be put to death on the spot by any one acting under the orders of competent authority, or, if arrested, may be tried in any manner which such authority shall direct; but if there be an abuse of the power so given him, and acts are done under it, not bona fide to suppress rebellion, and in self-defense, but to gratify malice, or in the caprice of tyranny, then, for such acts, the party doing them is responsible."

The hanging of Henriquez is also a case arising out of a conflict between military forces. He was charged with being a spy. His father says he did not participate on either side. It is not for me to determine which of these statements is true. He may have been a noncombatant, and his murder, like that of Rossi in the Case of Castioni, a misfortune (as it doubtless was in any view), and unnecessary in the enforcement of the governmental authority. But, conceding all this, the execution took place at the close of an important battle, and was undoubtedly connected with the turbulent condition of affairs prevailing at Coatepeque at that time, and was therefore of a political character

The robbery of the International Bank of Salvador & Nicaragua, at Santa Tecla, was an act known in the Central and South American states as a "forced loan," recognized by the treaty of amity between the United States of America and the republic of Salvador, ratified in 1874, wherein it is provided, in article 29, subd. 3, that:

"The citizens of the United States residents in the republic of Salvador, and the citizens of Salvador residents in the United States, shall be exempted * * * from all contributions of war, military exactions, forced loans in time of war," etc.

The reciprocal character of this provision does not deprive it of its plain purpose to protect American citizens residing in Salvador from a system of government exactions prevailing in Central and South American states, under some of their political administrations. In this case the money taken from the bank was receipted for, and, by order of Gen. Ezeta, delivered to a paymaster, with orders to pay the forces. Gen. Ezeta was at this time not only the commander in chief of the army, but he was also the acting president of the republic. As to the political character of this offense, there cannot be, it seems to me, a shadow of doubt.

The murder of Col. Tomas Canas presents a different state of facts from either of the other cases. Col. Canas was an officer in the army, commanding a brigade under Gen. Ezeta. On the morning of the 6th of June, 1894, Gen. Bolanos reported to Gen. Ezeta, at Santa Tecla, that Col. Canas had gone over to the enemy. As Gen. Ezeta and his staff were proceeding rapidly on the road to La Libertad, they met Col. Canas. The testimony is to the effect that Col. Canas rode up to Gen. Ezeta, and, taking him by the throat, said, "General, Manuel Rivas wants your head!" that Canas placed his hand on his revolver, and at the same time Gen. Ezeta drew his revolver and fired at him, and Col. Cienfuegos also fired three shots at Canas. It will be seen from this statement that the affair involves, not only the question of the political character of this offense, but its relation to the military law. Indeed, it is contended by counsel for the defendants that these four cases are all subject to the military, and not to the civil, law, and for that reason not subject to extradition. I will not enter into an extended discussion of this feature of these cases, but, as the murder of Col. Canas makes it necessary that I should consider that phase of the charge against Gen. Ezeta and Col. Cienfuegos, I will do so briefly. A general principle of military law is that no acts of military officers or tribunals, within the scope of their jurisdiction, can be revised, set aside, or punished, civilly or criminally, by a court of common law. Another principle of law is that offenses committed by persons in the military service during the time of war, insurrection, or rebellion, are punishable only by military tribunals. This is found in the law of Salvador, relating to the state of siege, in the following terms (article 5):

"The state of siege being declared, the crimes of treason, rebellion and sedition will be subject to the military authorities; also crimes against the public peace, independence and sovereignty of the state and infringement of the law of nations."

This provision is found substantially in article 58 of the articles of war provided for the government of the army of the United States.

In Coleman v. Tennessee, 97 U. S. 509, the supreme court of the United States had under consideration the question of jurisdiction under this law. The facts of that case were that a soldier in the military service of the United States, on the 7th of March, 1865, and during the war of the Rebellion, committed the crime of murder in the state of Tennessee. He was tried by a military court-martial, convicted, and sentenced to suffer death. After the constitutional relations of the state of Tennessee to the Union were restored, he was indicted in one of her courts for the same murder. To the indictment he pleaded his conviction before a court-martial. The plea being overruled, he was tried, convicted, and sentenced to death. The question in the supreme court of the United States was the jurisdiction of the state court over the person of the defendant, and it was held that the state court had no jurisdiction to try him for the offense, as he, at the time of committing it, was not amenable to the laws of Tennessee. Mr. Justice Field, speaking for the court in this case, said:

"The laws of Tennessee with regard to offenses and their punishment, which were allowed to remain in force during its military occupation, did not apply to the defendant, as he was at the time a soldier in the army of the United States, and subject to the articles of war. He was responsible for his conduct to the laws of his own government only, as enforced by the commander of its army in that state, without whose consent he could not even go beyond its lines. Had he been caught by the forces of the enemy, after committing the offense, he might have been subject to a summary trial and punishment by order of their commander; and there would have been no just ground of complaint, for the marauder and the assassin are not protected by any usages of civilized warfare. But the courts of the state, whose regular government was superseded, and whose laws were tolerated from motives of convenience, were without jurisdiction to deal with him."

I am unable to understand how the overthrow of the Ezeta government and the dissolution of its army change the status of this question. In the case just cited the disbandment of the Union forces and the restoration of peace, in April, 1866, did not affect the question of jurisdiction. Mr. Justice Clifford, in a dissenting opinion, suggests that the proceedings against Coleman by court-martial were abandoned by the return of peace. The sentence of the court-martial was never executed, and the learned justice says, "It is, perhaps, equally clear that it has become a nullity by the intervention of peace." The facts upon which the prevailing opinion is based do not conflict with this explanation why the sentence against Coleman was not executed.

It follows, as a conclusion from the principles declared by these authorities, that the military law of Salvador had jurisdiction to punish the accused, as military officers, for the offenses committed by them during the progress of the revolution, and, this being so, these four cases now under consideration, and particularly the charge against Antonio Ezeta and Juan Cienfuegos, for the murder of Tomas Canas, were properly within that jurisdiction, and not within the jurisdiction of the municipal law. If this fact does not, of itself, place these offenses outside the law of extradition, it at

least, makes it more certain that the offenses charged are of a political character, and therefore not within the provisions of the treaty. The defendants Antonio Ezeta, Leon Bolanos, and Florencio Bustamante will therefore be discharged, and Juan Cienfuegos held for extradition, to answer the charge of an attempt to murder Andres Amaya on the 3d of January, 1894.